The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. Good morning. This is case number 4-23-0553, People v. Bias. Counsel, at this point we'd like to have appearances. First for the appellant. Your Honor, Sarah Lucy, Office of the State Appellate Defender for the appellant Kamijah Bias. All right. Thank you. And for the affilee. Matthew Goldman for the people, Your Honor. Thank you. Ms. Lucy, you may proceed with your argument. Thank you, Your Honor. Good morning, and may it please the Court, Counsel. As I said, my name is Sarah Lucy from the Office of the State Appellate Defender, and I represent now 17-year-old Kamijah Bias. When she was just 15, 5'2 Kamijah Bias was waiting for her little sister outside of school when she was approached by three older boys. They were bigger and they would not leave her alone. When she tried to retreat to the sidewalk, they followed her, flinching at her. When she turned away from the direction she wanted to go and they went the direction they should have wanted to go, they returned and surrounded her. It is only at this point that she pulled out the knife that there is unrebutted testimony that she carried only for self-defense, and she used that knife in self-defense. Unfortunately, injustice plagued her case from start to finish, from her juvenile transfer hearing, where there was insufficient evidence presented on numerous statutory and non-statutory factors, to her actual trial, where the state did not negate self-defense, and to motions in limine that should have been renewed, all the way to sentencing. Unless this Court has questions on the third and fourth arguments, I will be concentrating the majority of my oral argument on the first two arguments in my brief. However, I am more than happy to speak on each of them. Briefly, Your Honor, to speak to the juvenile transfer hearing, I believe the most egregious lack of information that we see are on her court services, the court station adjustments that she Clark and Taylor has stated that the record in juvenile transfer hearings must be sufficient to allow for this court to have meaningful review. Indeed, there must be sufficient evidence for the trial court to consider every factor that is statutorily listed. Here, we have absolutely no details on what those station adjustments were for. An aggravated battery to a school personnel could be anything from coughing on a school personnel, or touching them, grabbing an arm, to something more egregious, which would have been beneficial to the state. But there is no evidence as to what it was. That goes far beyond what the evidence that was presented in In Re MD, or in People v. Clark. Again, cases where less evidence has been presented on prior criminal history, appellate courts have reversed and ordered a new juvenile transfer hearing. And what that ties into is the fact that the court found that she wasn't going to take advantage of any court services. It specifically says, I imagine that she didn't take advantage of the services offered after her station adjustments. But Your Honors, there was simply no evidence presented about what services she was offered, what services she took advantage of. The only service that we have her taking advantage of after this event occurred, she did incredibly well. She was participating in therapy. Dr. Eckert noted that she was eager to participate in therapy, showed a willingness that was not common amongst adolescents. The only unwillingness, if you'll use that term, if I may use that term, to go along with any services that she was provided was in middle school. She was seemingly unwilling to go to her IEP classes for speech and language therapy. But I don't believe that failing to go at age 12 or 13 to special classes should equal being denied the protections of juvenile court and being transferred into criminal court. And while the state may argue, well, the trial court below didn't use these factors very significantly, that's belied by the record. It's belied by what the trial court said. And indeed, it doesn't matter whether or not the court placed significant amounts of weight on these factors or hardly any weight at all. What matters is that the record is silent. This court cannot review, and the trial court could not significantly or meaningfully review the statutory factor where the state presented no evidence. For instance, there was no evidence of what Camaija's minimum sentence was. That's simply a black and white failure of the court to make sure that the record showed that every statutory and non-statutory factor had been considered. Without this record, this court cannot provide the meaningful review as mandated by the Illinois Supreme Court. The trial court below abused its discretion when transferring Camaija. This case must be remanded for an adequate transfer hearing. However, such a transfer hearing may not be necessary should this court come to the just conclusion that Camaija bias was acting in self-defense. This is not a situation where the facts are in question, where there is a great deal of credibility that we must give deference to the trial court below. Because here, really, this court is in the same position as the trial court below to judge the video, to judge the third-party witnesses, one of whose testimony was presented through audio recording. While there may have been a small amount of credibility weight, whether to give credence to Ms. Bias' testimony, whether to give weight to D.D.'s testimony, this case can be decided without either of those testimonies. The fact of the matter is the video shows that the three older, bigger boys approached Camaija outside of the school when she was just standing there. Ms. Lucey, could I ask you to bookmark where you're at right now in your argument so you can get back to it after you answer this question? But I want to combine basically where you're at now with the transfer proceeding. One of the elements or factors that the trial courts to take into account under the statute for transfer would be the circumstances of the offense, right? Correct, Your Honor. So here, obviously, one young man died. Your client is charged and convicted of first-degree murder. You're indicating now in your argument that she had a self-defense defense that should prevail at trial. In regards to the transfer proceeding, what should the trial court have done in evaluating the circumstances relating to the offense? What did it have before it that would have allowed it to retain her in juvenile court? What was it that the trial court saw or heard relating to the circumstances of the offense here that should have kept this in juvenile court, if that is indeed your argument? If you're not suggesting that the circumstances of the offense weighed in favor of retention in the juvenile court, maybe just answer that first. Your Honor, I believe the circumstances do favor her being retained in juvenile court. After all, what the trial court should have considered at the juvenile transfer hearing is that it was not able to see from watching the video played at regular speed precisely what had happened. In fact, the court asked the state to pull up the evidence on a point the state was able to play this video frame by frame. It is only by going frame by frame that the court was able to judge that Kamai Jebias had raised her arm or at least had completed raising her arm before Pierre was able to finish raising his arm. Were all of the videos that were potentially played at Ms. Jebias' bench trial presented at the transfer hearing? No, Your Honor. I believe fewer videos were presented at the juvenile transfer hearing, the one shot that perhaps shows the most action. Again, it was only by slowing it down to frame by frame that the court was able to believe that it knew what had happened. But I do think that supports that there was a clear self-defense present here. If the only way to tell that she was not acting in perfect self-defense is to slow it down to frame by frame, that's simply ignoring the reality of life, which is that it does not move at the speed of a frame. Indeed, even the state in its response brief had to parse this case down to, well, frame A shows that her arm is coming to the waist level. And at 12B, her arm is forthright. And it's not till 12D that Dee Dee is actually lunging at Kamai Jebias. But the difference between two frames or three frames is a matter of microseconds to imagine that any human being, even the most competent, the most intelligent, the most present-minded with the fastest reflexes could understand these moment-to-moment details is simply ignoring reality and ignoring precedent where appellate courts have found that there is no on-the-side umpire who is there to say whether it happened a microsecond before or after. I do believe that her self-defense defense was present at the juvenile transfer hearing. And the court erred in considering that the circumstances of her offense clearly weighed in favor of the transfer to criminal court, which is perhaps, as I believe the record shows, that was the factor that the court considered the most. Thank you. Counsel, if I may, at the transfer hearing, Detective Redpath testified he had reviewed all the footage before the transfer hearing. Do you agree that it's clear from the record that with regard to his testimony regarding the offense in this case at the transfer hearing that it was significantly different than his testimony at the criminal trial? Yes, Your Honor. I would agree with that. I don't have much more of an answer than that. I certainly could not issue an explanation, but I did note that there were significant differences. That is very interesting, certainly. Part of those differences were the number of individuals. You've referenced multiple times three individuals, as was stated at trial by the detective. But at the transfer hearing, what findings did the court have and what characterization did the state and Detective Redpath present? How did they present that evidence? Yes, Your Honor. Decidedly missing was Jaquan Wallace, the third gentleman. He can be seen throughout. He's rather identifiable by his red sweatpants. The court actually found that another student's testimony, Brandon Pittman, was unreliable because Brandon Pittman said there were three boys and the court said, well, there were clearly only two. And yet when we get to trial, the court does see that there were three boys, three young men. The state agrees that there are three young men. Everyone seems to acknowledge suddenly that Jaquan Wallace did, in fact, participate in walking up to Kamijah. He's the one actually who ran after her when she tried to escape at the very end. Is that something that you've raised in your briefing or argued? Is there a reason that you didn't argue that this particular characterization impacted the fairness of the hearing in your brief? Your Honor, honestly, it doesn't fit precisely under any of the statutory factors. I don't know how to say that to raise an issue that, well, they made a mistake. Witnesses make mistakes, so I wasn't sure how to raise it. If that was error, I can only apologize. I do believe that this court, in the interest of justice, should be able to review that. I do believe that the entire juvenile transfer hearing is called into question. Again, the error was mine for not raising that. The court is absolutely correct that it was wrong. Jaquan Wallace was there. And Jaquan Wallace is the man who never spoke to the police, refused to speak to the police at the time, would not testify at trial. D.D. refused to speak to the police immediately after, or excuse me, he did speak to the police but was reserved in the information that he gave and similarly was reserved during his testimony at trial. So what we have to rely on for what the conversations that were happening between those three older boys and Khamija is really from the teacher who observed Pierre in fourth and fifth periods and Brandon Pittman, who was a student who observed the events but was not really involved in either direction. And they all testified that Pierre was furious over the Snapchat video that depicted Khamija and her brother, the two younger brothers, Pierre and clearly infuriated Pierre. That's the only reason that we have in the record that the three older boys went over to talk to Khamija. To say that they were going over for a friendly chat is simply belied by everything that the record has. And so if they're approaching her in an aggressive manner, which they clearly are, even Detective Redpath at the trial says that D.D. flinches towards her in aggressive manner, they are the people who are threatening force. Khamija is not the initial aggressor, which is important for her self-defense. The video shows that the danger of harm was imminent. After all, it was not until the boys had her surrounded, the three boys had her surrounded, that she acted in any sort of self-defense manner. She did not immediately respond when the three boys came up to her in an aggressive manner. She retreated. She had her back to the street. She had her front to them. She had her hands up to show that they're empty. She walked away from where she wanted to go. It's not until she had no other means of escape, her back is against the buses, the three boys are around her, that she acts in self-defense. The threatened force against her was certainly unlawful. And that she actually and subjectively believed that a danger existed, I don't see how any person in her shoes could see that they're not in danger when aggressively surrounded by larger people. I don't know how much longer she could have waited while the state would have her entire testimony be thrown out as self-serving. She does testify, she believed that the threat was imminent. Your honors, given the evidence that was adduced at trial, the state did not negate any of the elements of self-defense. The right to self-defense exists before first blood is drawn. And I believe that is what we see here, especially where the court, not only in the juvenile transfer hearing, but also during the trial, had to have it come down to a frame-by-frame replay. The video itself was not sufficient to show who struck first, because everything was unfolding so quickly. It is only frame-by-frame that you can see that Kamaja's arm comes up first, which only shows that she was faster. But indeed, Pierre was beginning to swing, Dede was beginning his lunge, the three older boys were surrounding her. Had she waited a second longer, it could have been a story that ended in her tragedy, and unfortunately not in Pierre's. Your honor, my time has nearly elapsed. I will reserve any arguments on mistaken self-defense or involuntary manslaughter until my rebuttal, unless this court has any questions on those now that I should get to. I have a question which relates to the transfer hearing. It seems to me, as you're saying, that the evidence at trial gave a totally different perspective, and that it showed self-defense, but that at the transfer hearing, there was insufficient evidence regarding her prior station adjustments, insufficient evidence regarding services, and insufficient evidence or misremembered evidence or misconstrued evidence that prompted the transfer. In fact, the transfer hearing was totally flawed, both because of changing testimony and because of the things that you've noted that were absent. Absolutely, your honor. Wholly, 100%, completely deficient in every way, though the only thing I would note is that the evidence was present for self-defense there, had the court not parsed it down to a frame by frame. I don't think that the difference didn't consider that Jaquan Wallace was there. The fact that the court thought that it was two older, larger boys rather than three older, larger boys, I don't know that that negates her self-defense. In fact, I said I don't know. Let me rephrase. It did not negate her self-defense, but the court is 100% correct that my argument is that it's fully deficient. Thank you. Thank you. Counsel, just for clarity, the remedy that you're requesting of this court is remand then for a new transfer hearing? Certainly. I believe that the correct remedy in this case, because there has already been a trial, the state has had the opportunity to present its case in its entirety and failed to negate any of the elements of self-defense, is actually for this court to vacate her conviction fully. Should this court decline to do so, however, yes, the alternative remedy would be for remand for a new transfer hearing. Thank you. Thank you. Okay. Thank you, Ms. Lucy. You're out of time, but you'll have time in rebuttal. Mr. Goldman, you may proceed with your argument. Thank you, Your Honor. Matthew Goldman for the people. May it please the court and counsel. Your Honors, I'm going to start with the self-defense claim because I think that that is the more contentious issues that counsel brought up. It is true that you had to slow it down to frame by frame to see that Ms. Baez struck first. And it is true that things happen very quickly, but it's important to note that the only reason things happen so quickly is because she struck so quickly. There was no indication that Pierre or Dede were going to swing, that they're going to weapons, that they're going to do anything violent up until the point that she stabbed him in the heart with her knife. So the suggestion that this was some sort of situation where it's two gunslingers with their hands on their hips waiting to see who strikes first, that isn't what's happening here. As far as the evidence shows, as far as it would be accurate to say, counsel, three gunslingers? Perhaps, Your Honor. There were more people. What do you mean perhaps? Were there three people within her view and close to her so that, as appellant's counsel indicated, she was surrounded or at least confronted by three people? Yes, I would certainly say that that's accurate. I think that based upon what was shown, it's a little bit unclear as to the degree of participation of the third individual, which I think explains a little bit of why people might have been confused as to the number of people initially. If I may, though, I mean, that individual is with Dede and Pierre when they're leaving the school from inception, correct? And then walks outside with them and is with them the entire time. Correct. But again, it doesn't appear that this person was one of the people who was attacked with the knife. So the level of participation, certainly the person runs after misbias, as counsel indicated. So it's a little bit different as to the degree of participation that this person wasn't injured. There's a lot of people milling about. It's schools letting out. That's not to say that this is a completely reasonable thing for somebody to see based upon the video. I certainly agree that this person appeared to be part of the group, appeared to be friends. But I'm simply saying that at first glance, watching the video, due to the number of people, due to the way that things are occurring, most people are moving in the same direction via schools letting out. This is a situation where it's not completely outside the bounds for somebody to see this video and not immediately recognize that this person was part of the group of three. And in fact, at the transfer hearing, though, some of the evidence was challenged on the fact as to whether there were two or three individuals there, correct? And the state characterized it as only being two individuals, including Pierre. And Detective Redpath also indicated that. And did they not attack the credibility of one of the witnesses who indicated there were two individuals because it could not be reflected in the video? At the transfer hearing? Yes. That sounds correct, Your Honor. And then at trial, it was presented by the state clearly that it was three individuals. So there is a discrepancy between how the state presented that at trial versus how it was presented to the court at the transfer hearing. Yes, Your Honor. There certainly is a discrepancy. Okay. But getting back to the self-defense argument, for this court to decide that counsel's argument fails and the defense's argument fails regarding self-defense, this court only needs to conclude that a reasonable trier fact could find one of these elements, one of these factors is negated by the state. And under these circumstances, it shows that in this frame-by-frame video, that there was nothing that had happened, nothing that Pierre did, nothing that Dede did, that would cause the defendant to believe she needed to strike with her knife. They didn't have a weapon in their hands. Pierre didn't even raise his hands until the defendant had begun to move towards him. So this is a situation where the only reason action occurred is because she started it. Mr. Goldman, what about imperfect self-defense? The second degree self-defense? Well, Your Honor, I think that in resolving that issue, this court should rely on the standard that we review these things with on appeal. So could a reasonable finder of fact conclude that she didn't have even essentially an unreasonable self-defense or a mistaken belief self-defense? Well, under these circumstances, essentially for the court, they had to decide, is her explanation true or is it something that she came up with afterwards to explain her actions? And I think that a reasonable person, when viewing all of the evidence, when reviewing the fact that she admitted on cross-examination that she saw his hands were down and then she struck with her knife, that her explanation that she was so fearful she felt she needed to strike, this didn't add up, that this was essentially a lie, that her statement that she believed she was in such danger she needed to use that kind of lethal force, that wasn't honest. And so I think this court, when reviewing that, can decide, well, reasonable minds maybe can differ, but can a reasonable trier of fact come to that conclusion? I think very clearly a reasonable trier of fact could believe that she was being dishonest when she said that she felt threatened. Mr. Goldman, it understood through, given the amount of questioning in regards to the transfer proceedings in opposing counsel's portion of the argument, there is concern there. Could you address that so that you don't run out of time in that regard? Of course, Your Honor. So regarding the transfer hearing, I think that each of defendants' arguments related to the individual factors run into the same fatal flaw, which is counsel is arguing that no evidence was presented on certain factors, but the discussion of these factors shows that there was some evidence on each factor. This isn't a situation where evidence is completely absent from any of these factors. The situation that this court is facing is not one where you assume that the court abused its discretion because it didn't have any information to consider, but instead one where this court should decide, was the court abusing its discretion based upon the way it assessed all of these factors, which it did have evidence for? Now, I certainly would agree. The court did not have perfect evidence. This is not necessarily the sterling example of a transfer hearing, but when looking to the stuff that the court did have, the evidence that the it's very clear that evidence was presented on each factor, and I would argue that this court should then consider, was the way in which that evidence was interpreted an abuse of discretion? I would argue that based upon the evidence that was presented, the court gave proper weight to each of the factors. Certain things like the defendant's background, the court agreed. It was not particularly significant. I think nobody would say that a couple of station adjustments show that this person was prone to excessive criminality before this incident, but this is a situation where the court had information on these factors and had to weigh those potentially less impactful factors against the more impactful factors, such as the severity of the offense. This is a situation where, as your Honor's noted, a kid died. Another person had their lung collapsed. This was a very, very serious offense, and so when viewing all of the factors together, I think the court correctly noted that certain factors did not favor transfer strongly, but did note that due to the severity of the offense primarily, ultimately transfer was appropriate. Counsel, if I may, other than the testimony and the report of Sangamon County Services Officer Melcher, did the state provide any other evidence with regards to the defendant's delinquency? So you're saying in addition to essentially the station adjustments and these sort of informal disciplinary issues? Yes, and if you could, it appears to me that that information that was presented was very vague, and I think you've touched upon that, but it appears to me, you know, they mentioned the two fights at the Peoria Detention Facility, but there's no details that I could find in the record as to the specific factual basis of those fights, who started them, which I think would be very important, and if I, I guess I'm asking, is that somewhere in the record that you could direct my attention to with regards particularly to the fights or other evidence that may have been presented other than that report? Your Honor, I don't have any additional evidence regarding that. I don't think I can point to any, you know, if you're looking for a specific factual background for these station adjustments, I don't have anything like that. I would argue that this is a situation, though, in which, you know, I agree, there could have been significantly more evidence regarding the adjugatory or disciplinary history. However, there was evidence presented, and so I would argue to this court that when you're facing a situation in which the court did have some evidence to consider, the question isn't, did they abuse their discretion because they made a decision based upon no evidence, but instead, did they abuse their discretion because they made the wrong decision based upon the evidence they had? And under these circumstances, again, the court looked at the adjudicatory and disciplinary history. I believe the court made a specific comment that it didn't find that these things weighed strongly in favor of transfer. And so based upon that, Your Honors, I would argue that the court ultimately did not abuse its discretion because it essentially gave this factor the weight it deserved. It found that this was not something that indicated that she had a essentially strong history of bad behavior. In counsel, just one other question with regards to the mandatory minimum that she would face if she was transferred to criminal court. It appears to me at the transfer hearing, the state argued 20 to 60 years. Is there anywhere in the record to establish at the transfer hearing that the court knew the minimum was 27 and not 20 years, as the state had argued? Yes, Your Honor. So first, I would simply note that the presumption is that the court does know the law. And in the motion that the state filed for transfer, the state actually did quite a good job of laying out very clearly what the sentencing ranges were for the various offenses, and even noted that the first degree murder would be mandatorily consecutive to essentially the other offenses. So under these circumstances, the court had that information directly before it. And based upon the record and the way that the court was issuing its decision, it references the motion when it's rendering its decision. So it had it in front of it when rendering its decision. It had all that information there. I would argue that based upon the presumption that the court knows the law and the fact that it had essentially this very clear set of information in front of it at the time that it was rendering its decision, it had the information that it needed to know that 27 would be the minimum. Additionally, Your Honor, I believe at the, excuse me, it was at a different hearing, the court did correctly state the mandatory minimum. At this time, I don't recall what specific hearing it was. I do know I cited in my brief. But that would also be an indication that the court was well aware of what the mandatory minimum sentence was. And I would argue that this is a situation that is distinct from other cases in which combining two offenses makes something go automatically become mandatory life, for example. Those are situations that where the court is dealing with, perhaps, I don't know if unusual is the right word, but certainly it's not the most common situation. It's something where the court might be unfamiliar with that particular part of the law. Whereas here where the court is informed by the motion that these things are mandatory consecutive sentences are very run of the mill. This is a situation where I think this court can presume that the court knew what that minimum sentence was. Does that answer your question, Your Honor? Thank you. Thank you. So, Your Honors, based upon the fact that the court did receive evidence on these factors, even though that evidence may not be up to a sterling standard, the court had enough with which to render its decision. And I would argue that this court should conclude that the trial court did not abuse its discretion. Your Honors, I already addressed the self-defense claim and the mistaken belief self-defense claim. If there are no further questions, I would simply argue that this court should affirm the trial court. And if there's nothing else for the remainder, I would simply stand on my brief. Okay. Thank you, Mr. Goldman. Ms. Lucy, rebuttal argument? Thank you, Your Honor. A quick correction, if I may. I would direct the court to Supplemental Record 3, pages 203 and 204, where the trial court noted that it was unable to pull up the state's motion on its computer and asked the state for a paper copy. So, it actually did not have access to the state's motion at the time that it made its decision. It asked for the paper copy on page 204. On 203 is where the court made its decision that punishment through the juvenile court system is wholly inadequate. So, the decision was made, and then the court was able to look at the state's motion where it listed the mandatory minimums for each count and said that they were mandatorily consecutive. If that's sufficient for the court, that could have been enough if it had been presented to the court before the transfer actually occurred. It appears from the record that during the transfer hearing, the court did not have that information before it. And I believe what the state is ignoring here is that this is not a normal proceeding where the court can simply be presumed to know the law, to have applied the law correctly. This is a juvenile transfer hearing where it must be on the record to allow for this court to have meaningful review. If we simply presume that all courts know what the mandatory minimum sentence is and what is and what is not mandatorily consecutive, then people v. Clark, which is still Illinois Supreme Court precedence, is meaningless. If the court were presumed to know that the defendant in Clark was subject to a 21-year mandatory minimum, then the Illinois Supreme Court would not have decided the case that way. So, that simply is not what the case law states. I would also just like to say, Your Honor, there is no evidence in the record about what Camaija was given station adjustments for. The name of the charge cannot be sufficient where it was not sufficient in Clark. Indeed, in Clark, the court actually got more information. Here, the court only got the bare-bones name of the offenses. If Clark was insufficient information such that the Illinois Supreme Court had to reverse, how can it not be reversible when this court got less information? There was no evidence in the record about what the fights at Peoria Juvenile Detention Center were for. There was no evidence in the record about what services the court had previously given her for her station adjustments, if any. There is no evidence in the record about whether or not Camaija Bias perfectly complied with her station adjustment court services or didn't comply at all. There is no evidence. There is no evidence about the treatments she could have received in the Department of Corrections. There is no evidence about the mandatory minimum. This is not just not the sterling standard of a juvenile transfer hearing. This is the very picture of a wholly inadequate transfer hearing that goes further than the facts in People v. Clark in almost every single way. If the Illinois Supreme Court had to reverse for a new transfer hearing in People v. Clark, this court must reverse in this case for a new transfer hearing if this court declines to simply vacate her conviction for first-degree murder when her self-defense was so evident, as this court pointed out. There were three gunslingers. Detective Redpath himself testified that the three boys were squaring up with Camaija outside of the buses. DeeDee admitted that Camaija and Pierre got into what he characterized as a little fight. DeeDee was himself not able to say who swung first. He testified it happened quick, like quick. So while the state would parse out these moments, these tiny frames in time and say, well, nobody else was striking, so she didn't have the right to strike. Well, first of all, the threat just has to be imminent, and it clearly was. And second of all, DeeDee was already in his lunge. The boys were already squaring up with her. She had no more time on the clock. She had backed away. She had turned away. She did everything right. She did everything a girl could do. And at the last moment, she defended herself. Your that it remand this case for a new juvenile transfer hearing. Thank you. All right. Thank you, counsel. Thank you both. The case will be taken under advisement, and we will issue a written decision.